232

Charles GARY, Respondent,

v.

Hattie M. ASKEW, Will Outlaw, and Deboria Outlaw, individually and d/b/a Low Country Medical Transport; Low Country Medical Transport, Inc.; Eugene A. Kirkland; and American Medical Response, Inc. (d/b/a Access2Care), Defendants.

Of whom American Medical Response, Inc. (d/b/a Access2Care) is the Appellant.

Appellate Case No. 2013–002674
Opinion No. 5406

Court of Appeals of South Carolina.

Heard July 15, 2015

Filed June 1, 2016

Rehearing Denied August 17, 2016

Robert H. Hood, Robert Holmes Hood, Jr., and H. Cooper Wilson, III, of Hood Law Firm, LLC, of Charleston; C. Mitchell Brown, Brian Patrick Crotty, and Michael J. Anzel-

mo, of Nelson Mullins Riley & Scarborough, LLP, of Columbia, all for Appellant.

Joseph Dawson, III, of North Charleston, for Respondent.

WILLIAMS, J.:

In this civil action, American Medical Response, Inc. (AMR) appeals the circuit court's grant of summary judgment in favor of Charles Gary as to his negligence and loss of consortium claims. AMR argues the court erred in (1) holding AMR could not escape liability for the negligent actions of a subcontractor because it owed Gary an absolute, nondelegable duty to provide safe transportation pursuant to its contract with the South Carolina Department of Health and Human Services (SCDHHS) and public policy; and (2) prematurely granting summary judgment in favor of Gary when AMR was not afforded a full and fair opportunity to conduct discovery. We reverse and remand.

## FACTS/PROCEDURAL HISTORY

On September 9, 2010, SCDHHS issued a request for proposal (RFP) regarding the provision of brokerage services for the South Carolina nonemergency medical transportation (NEMT) program. The program was designed to provide nonemergency transportation services to Medicaid members who needed access to medical care or services. AMR responded to the RFP, and on May 25, 2011, SCDHHS awarded AMR a five-year contract (the Contract) to provide brokerage services in two of the three SCDHHS regions in South Carolina. The parties agree the RFP bid documents formed the basis of the Contract under which AMR served as a broker for the NEMT program.[1]

The Contract distinguished the broker from the transportation providers, who were responsible for providing the actual transportation services. Under the Contract, AMR was required to recruit qualified transportation providers but could "not provide NEMT services or make a referral to or subcontract with a transportation provider" if it had "a financial relationship with the provider." Moreover, section 3.3.6 of the

---

1. As the circuit court noted, in South Carolina, the parties do not sign a separate contract after the RFP process is completed.

Contract provided the only time a broker could operate vehicles to provide transportation services was in the "very limited circumstances" set forth in 42 C.F.R. § 440.170(a)(4)(ii)(B) (2012).[2]

As the broker, AMR's responsibilities within the NEMT program included "operating a call center and contracting with transportation providers to fulfill the services," as well as establishing "a system that ensures high quality and appropriate medical transportation services are provided to South Carolina's Medicaid population." AMR was also "responsible for identifying, recruiting, and negotiating service agreements with transportation providers ... to meet the needs of Medicaid members in the region." Further, AMR was required to "immediately take necessary and corrective steps when representatives of SCDHHS identif[ied] inappropriate, undesirable, or otherwise poor service."

The Contract also required AMR to perform several core brokerage services "throughout the life of the [C]ontract." In particular, AMR was charged with processing transportation requests for members, verifying their eligibility for Medicaid, operating a call center, recruiting and maintaining an adequate transportation provider network, and providing administrative oversight for the NEMT program. Section 3.3 set forth AMR's various operational requirements:

### 3.3.5 Fulfillment of All Trip Requests:

3.3.5.1 The [b]roker is responsible for fulfilling all verified trip requests and ensuring that all trips are completed safely and on-time. SCDHHS expects the [b]roker to provide trip coverage twenty-four (24) hours a day, seven (7) days a week.

3.3.5.2 Fulfillment of all verified trip requests and ensuring that all trips are completed safely and on-time must include verification of the delivery of transportation services through the use of tracking tools and cost effective methods to determine the real-time location of members, verification of

---

2. The limited circumstances outlined in subsection (B) of the regulation primarily involve situations in which no other qualified providers are available or able to provide the NEMT service. *See* § 440.170(a)(4)(ii)(B)(1)–(4). As Gary's counsel conceded during oral argument, none of the exceptions are applicable here.

member delivery to the medical service, vehicle location and disposition[,] and to aid trip recovery processes. The functionality of tracking tools and methods must be explained operationally and approved by SCDHHS.

. . . .

### 3.3.7 Insurance:

In addition to the strict quality assurance standards that the transportation providers must meet, the [b]roker must ensure transportation providers have insurance coverage. State law and regulations specify minimum insurance requirements for entities involved in the provision of Medicaid [t]ransportation [s]ervices. The [b]roker is responsible for ensuring required and adequate coverage is obtained and maintained during term of contract.

### 3.3.8 Accidents, Injuries, and Incidents:

The [b]roker must promptly report to SCDHHS accidents, injuries, and incidents that have occurred in conjunction with a scheduled trip if a [m]ember was present in the vehicle.

. . . .

### 3.3.9 Trip Recovery:

The [b]roker must ensure that each provider is responsive to all vehicle breakdowns, problems[,] or delays in delivering service. The [b]roker must ensure that the provider has adequate backup vehicles to recover the trips, and ensure that members are not late for their appointments and do not spend excessive time on the vehicles.

### 3.3.10 Notification by Transportation Providers:

The [broker] must ensure that the transportation provider immediately informs [b]roker of any breakdown, accident[,] or incident as well as any other problems that might cause a delay of more than ten (10) minutes in the trip. Immediately after the [b]roker is notified of a delay exceeding ten (10) minutes, the [b]roker must also notify the members or their representatives and the facilities or families at the destination point. If necessary, other transportation should be arranged to ensure appropriate transport.

Additionally, section 3.3.15 required AMR to develop a detailed monitoring plan and monitor the transportation provid-

ers with whom it subcontracted to confirm they were providing quality and safe services. If information and reports indicated otherwise, then subsection 3.3.15.1 required AMR to take corrective action:

> The [b]roker must have written procedures in place for taking appropriate corrective action whenever inappropriate or substandard services are furnished or when services that should have been furnished were not. In addition, the [b]roker must have written procedures for taking appropriate action if a transportation provider is out of compliance with federal or [s]tate laws or regulations. The [b]roker must report, not less than monthly, to SCDHHS on monitoring activities, monitoring findings, corrective action taken, and improvements by the transportation provider.

Section 3.11.1 provided AMR was "responsible for receiving and responding to all complaints about NEMT services under this contract, whether oral or written, from members, transportation providers, health care providers, facilities, SCDHHS[,] or other sources." Under subsection 3.12.1.1, the quality assurances provision, AMR was required to "provide assurance that transportation providers meet health and safety standards for vehicle maintenance, operation, and inspection; driver qualifications and training; member problem and complaint resolution; and the delivery of courteous, safe, and timely transportation services."

On January 31, 2012, Gary and his wife were passengers in an ambulance returning home from Gary's medical appointment. Gary's wife had scheduled the trip by calling AMR, which processed her request for NEMT. Low Country Medical Transport, Inc. (Low Country), a subcontractor under AMR's contract with SCDHHS, provided the NEMT service for Gary and his wife that day. Eugene Kirkland, a Low Country employee, drove the ambulance used to transport the couple. Prior to reaching Gary's home, the ambulance left the roadway and struck a tree. As a result of the accident, Gary suffered injuries and his wife died.

Gary filed the instant lawsuit against AMR and other defendants [3] (collectively "Defendants") on October 26, 2012,

---

**3.** The other named defendants were Hattie Askew, Will Outlaw, and Deboria Outlaw—both individually and in their capacities as owners

asserting claims for negligence, loss of consortium, and negligent infliction of emotional distress. Following limited discovery, Gary filed a motion for summary judgment on all claims against Defendants. The circuit court held a hearing at which the parties filed memoranda on the motion. After the court requested further briefing, AMR and Gary filed supplemental memoranda. Thereafter, AMR's counsel filed an affidavit pursuant to Rule 56(f), SCRCP, asserting summary judgment was premature at that stage because the parties had not conducted material discovery. In the affidavit, AMR's counsel argued AMR could not properly oppose the motion for summary judgment "without an opportunity to conduct written discovery and complete the necessary depositions," specifically noting Gary had not yet been deposed.

The circuit court issued an order granting summary judgment in favor of Gary as to all claims against all Defendants. AMR subsequently filed a motion to alter or amend judgment, and after a hearing on this motion, the circuit court issued a new order modifying its previous order. In its new order, the court granted summary judgment in favor of Gary only as to the negligence and loss of consortium claims, and denied his motion for summary judgment as to the negligent infliction of emotional distress claim.

Regarding Gary's negligence claim, the circuit court held "Defendants individually and collectively owed the Plaintiff a duty of care when they decided to engage in the business of NEMT services in South Carolina." Relying upon sections 3.3.5 and 3.3.15 of the Contract, the court held AMR owed Gary a duty "arising out of its Contract and operating as a broker of NEMT services." Moreover, the court held AMR "had a contractual duty and responsibility to provide safe and reliable NEMT services to Medicaid members pursuant to its contract with [SCDHHS]." The court then concluded all Defendants "breached their duty of care to Mr. Gary when Low Country Medical's ambulance ran off the road."

After finding AMR had an absolute duty to provide safe transportation, the circuit court held that, "[g]iven the duties

and officers of Low Country—as well as Low Country and Kirkland. Because AMR is the sole appellant in this case, we discuss the claims only as they relate to AMR.

imposed under the Contract and the extensive control [AMR] had over its NEMT service providers, [AMR] cannot walk away from its responsibilities under its NEMT Contract where the duties are so important to the Medicaid members and simply transfer it to another." According to the court, SCDHHS's "Contract clearly indicates that public policy and its Contract impose a non-delegable duty on the NEMT [p]rogram administrators to provide competent and safe non-emergency medical transport services to Medicaid members, pursuant to a significant number of control measures and protocols."

Finally, with respect to Gary's loss of consortium claim, the circuit court stated it was "clear"—based upon its earlier findings—the death of Gary's wife was caused by Defendants' negligence. Therefore, the court found Gary was "entitled to compensatory damages against the Defendants for the loss of his wife's companionship, aid, society, and services." This appeal followed.

## ISSUES ON APPEAL

I. Did the circuit court err in holding AMR liable for the negligent actions of Low Country based upon its finding that AMR owed Gary an absolute, nondelegable duty to provide safe transportation pursuant to the Contract and public policy?

II. Did the circuit court err in granting summary judgment in favor of Gary as to his negligence and loss of consortium claims when AMR was not afforded a full and fair opportunity to conduct discovery?

## STANDARD OF REVIEW

The purpose of summary judgment is to expedite the disposition of a case that does not require the services of a factfinder. *Dawkins v. Fields*, 354 S.C. 58, 69, 580 S.E.2d 433, 438 (2003). "Summary judgment is a drastic remedy and must not be granted until the opposing party has had a full and fair opportunity to complete discovery." *Id.* at 69, 580 S.E.2d at 439. "Summary judgment is not appropriate when further inquiry into the facts of the case is desirable to clarify the application of the law." *Brockbank v. Best Capital Corp.*, 341 S.C. 372, 378, 534 S.E.2d 688, 692 (2000). An appellate court reviews a grant of summary judgment by applying the same

standard as the circuit court under Rule 56(c), SCRCP. *Wood-son v. DLI Props., LLC*, 406 S.C. 517, 528, 753 S.E.2d 428, 434 (2014).

> Summary judgment is proper if, viewing the evidence and inferences to be drawn therefrom in a light most favorable to the nonmoving party, the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show ... no genuine issue of material fact [exists] and ... the moving party is entitled to judgment as a matter of law.

*Id.* "Because the construction of a clear and unambiguous contract is a matter of law for the court, we review the [circuit] court's findings of law de novo." *Lee v. Univ. of S.C.*, 407 S.C. 512, 517, 757 S.E.2d 394, 397 (2014) (emphasis omitted).

## LAW/ANALYSIS

### I. Nondelegable Duty

AMR contends the circuit court erred in finding AMR owed an absolute, nondelegable duty to provide safe transportation to Gary pursuant to both the Contract and public policy.[4] We agree.

 "The general rule is that an employer is not vicariously liable for the negligent acts of an independent contractor." *Rock Hill Tel. Co., Inc. v. Globe Commc'ns, Inc.*, 363 S.C. 385, 390, 611 S.E.2d 235, 238 (2005). "An exception to the general rule is that '[a] person who delegates to an independent contractor an absolute duty owed to another person remains liable for the negligence of the independent contractor just as

---

4. AMR also argues the circuit court erred in concluding its alleged contractual duty to provide safe transportation gave rise to tort claims. According to AMR, the court misconstrued the Contract's language to impose a duty that equated to strict liability for any and all accidents. Although we agree the court erred in construing the Contract, we reject the remainder of AMR's argument. The circuit court found AMR liable under the nondelegable duty doctrine, not a theory of strict liability. Further, contrary to AMR's contentions, the Contract could potentially give rise to tort claims. *See, e.g., Dorrell v. S.C. Dep't of Transp.*, 361 S.C. 312, 318, 605 S.E.2d 12, 14 (2004) ("A tortfeasor may be liable for injury to a third party arising out of the tortfeasor's contractual relationship with another, despite the absence of privity between the tortfeasor and the third party."). Nevertheless, our focus is solely on the issue of whether AMR owed an absolute, nondelegable duty to Gary.

if the independent contractor were an employee.' " *Id.* (alteration in original) (quoting *Durkin v. Hansen*, 313 S.C. 343, 347, 437 S.E.2d 550, 552–53 (Ct. App. 1993)). Our supreme court has explained the exception to the rule—the nondelegable duty doctrine—as follows:

> The term "nondelegable duty" is somewhat misleading. A person may delegate a *duty* to an independent contractor, but if the independent contractor breaches that duty by acting negligently or improperly, the delegating person remains *liable* for that breach. It actually is the liability, not the duty, that is not delegable. The party which owes the nondelegable duty is vicariously liable for negligent acts of the independent contractor.

*Simmons v. Tuomey Reg'l Med. Ctr.* (*Simmons II* ), 341 S.C. 32, 42, 533 S.E.2d 312, 317 (2000).

As scholars have noted, "nondelegable duty does not describe direct liability in the sense of breach by or fault of the delegator; it is a species of vicarious liability, liability for the fault of another based not on the delegator's fault but on policy considerations." Martin C. McWilliams, Jr. & Hamilton E. Russell, III, *Hospital Liability for Torts of Independent Contractor Physicians*, 47 S.C. L. REV. 431, 453 (1996). "The difference between direct liability and a nondelegable duty is subtle but important." *Simmons v. Tuomey Reg'l Med. Ctr.* (*Simmons I* ), 330 S.C. 115, 123, 498 S.E.2d 408, 412 (Ct. App. 1998), *aff'd as modified*, 341 S.C. at 32, 533 S.E.2d at 312.

> The real effect of finding a duty to be nondelegable is to render not the duty, but the liability, not delegable; the person subject to a nondelegable duty is certainly free to delegate the duty, but will be liable to third parties for any negligence of the delegatee, regardless of any fault on the part of the delegator.

McWilliams & Russell, *supra*, at 452.

Our courts have found a nondelegable duty to exist in a limited number of cases:

> An employer has a nondelegable duty to employees to provide a reasonably safe work place and suitable tools, and remains vicariously liable for injuries caused by unsafe activities or tools under the employer's control. A landlord who undertakes repair of his property by use of a contractor

has a nondelegable duty to see that the repair is done properly, and remains vicariously liable for injuries caused by improper repairs.

A common carrier has a nondelegable duty to ensure that cargo is properly loaded and secured, and remains vicariously liable for injuries caused by an unsecured load. A bail bondsman has a nondelegable duty to supervise the work of his employees, and remains vicariously liable for injuries caused by those employees. A municipality has a nondelegable duty to provide safe streets even when maintenance is undertaken by the state [h]ighway [d]epartment, and remains vicariously liable for injuries caused by defective repairs.

*Simmons II*, 341 S.C. at 42–43, 533 S.E.2d at 317–18 (footnotes omitted). These "cases clearly illustrate that a person or entity entrusted with important duties in certain circumstances may not assign those duties to someone else and then expect to walk away unscathed when things go wrong." *Id.* at 44, 533 S.E.2d at 318.

In *Simmons II*, our supreme court added to the list of cases, holding that "a hospital owes a nondelegable duty to render competent service to its emergency room patients." 341 S.C. at 50, 533 S.E.2d at 322. The court, however, declined to impose an absolute, nondelegable duty on hospitals and instead chose to adopt an "ostensible agency" approach, stating as follows:

One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

*Id.* at 50–51, 533 S.E.2d at 322 (citing RESTATEMENT (SECOND) OF TORTS: EMPLOYERS OF CONTRACTORS § 429 (AM. LAW INST. 1965)). Although the court did not limit its decision to cases involving emergency room physicians, the court stated it was limited to "situations in which a patient seeks services at the hospital as an institution[ ] and is treated by a physician who

reasonably appears to be a hospital employee." *Id.* at 52, 533 S.E.2d at 323.

On the other hand, in *Young v. South Carolina Department of Disabilities and Special Needs,* our supreme court held the circuit court erred in finding the Department of Disabilities and Special Needs (DDSN) liable for torts committed by an employee of a local board under the nondelegable duty doctrine. 374 S.C. 360, 368, 649 S.E.2d 488, 492 (2007). The General Assembly created the board at issue in *Young* as part of a statewide network of local boards to serve as "the administrative, planning, coordinating, and service delivery bod[ies] for county disabilities and special needs services funded in whole or in part by state appropriations to the [DDSN] or funded from other sources under the department's control." 374 S.C. at 366, 649 S.E.2d at 491 (quoting S.C. Code. Ann. § 44–20–385 (2002)). The local board, by statute, was established as a separate entity from DDSN, and the counties promulgated ordinances giving it authority to employ personnel. *Id.* In granting summary judgment in favor of the estate of a disabled child, the circuit court held DDSN liable for torts committed by an employee of the local board under the nondelegable duty doctrine, finding DDSN had been entrusted with important duties and could not delegate those duties to the local board. *Id.* at 363, 368, 649 S.E.2d at 489, 492. Our supreme court reversed, however, and found the nondelegable duty doctrine did not apply because the local board was "established as a separate entity with powers and duties separate from DDSN," and the duties exercised by the board were directly derived from the statutory scheme enacted by the General Assembly. *Id.* at 368, 649 S.E.2d at 492.

Likewise, in *Rock Hill Telephone,* our supreme court held a utility did not have an absolute, nondelegable duty to install an underground cable along a highway in a safe manner. 363 S.C. at 388, 391–92, 611 S.E.2d at 236, 238–39. In that case, the utility needed to establish its initial liability for a subcontractor's negligence prior to seeking equitable indemnification. *Id.* at 391 n.4, 611 S.E.2d at 238 n.4. Thus, the utility argued it had a nondelegable duty to perform the work in a safe manner stemming from language in a permit issued by the South Carolina Department of Transportation (DOT), statutory law, and regulatory law. *Id.* at 391, 611 S.E.2d at 238. In holding

the provisions cited did not impose a nondelegable duty on the utility, the court reasoned (1) "the terms in the permit [we]re enforceable only as between the DOT and the utility, not the utility and a remote independent contractor"; and (2) "the statute and the regulation impose[d] a duty of reasonable care, not an absolute, nondelegable duty." *Id.* at 392, 611 S.E.2d at 238–39.

■ Turning to the instant case, the circuit court appeared to rely heavily upon sections 3.3.5 and 3.3.15 of the Contract—both of which reference trips being conducted safely—in holding AMR owed an absolute, nondelegable duty to provide safe transportation to Gary. Indeed, the circuit court stated Gary's claim was "predicated on [AMR]'s non-delegable duty to ensure all trips are completed safely and on time." We find the circuit court misinterpreted the nature of AMR's duties and responsibilities under the Contract and, as a result, erred in holding AMR owed an absolute, nondelegable duty to provide safe transportation to Gary.[5]

In interpreting section 3.3.5, the court overlooked an important provision immediately following subsection 3.3.5.1 that clarified the parties' intent regarding the requirement that AMR ensure "all trips are completed safely and on time." Specifically, subsection 3.3.5.2 provided the following:

> Fulfillment of all verified trip requests and ensuring that all trips are completed safely and on-time must include verification of the delivery of transportation services through the use of tracking tools and cost effective methods to deter-

---

5. Curiously, the circuit court used varying language in announcing the nondelegable duty it found AMR owed Gary. In one instance, the court found AMR had a nondelegable duty "to provide competent and safe non-emergency medical transport services to Medicaid members, pursuant to a significant number of control measures and protocols." On the next page of the order, the court stated Gary's claim was based upon AMR's nondelegable duty "to ensure all trips are completed safely and on time." Although the court used different language, each phrasing is consistent with its overall conclusion that AMR had an absolute, nondelegable duty to provide safe transportation to Gary. Further, when asked at oral argument what specific duty AMR owed Gary, Gary's counsel responded that AMR had a duty "to provide safe transportation to and from medical appointments because he is a Medicaid member seeking that service." Thus, for consistency purposes, we analyze whether a nondelegable duty exists based upon this phrasing.

mine the real-time location of members, verification of member delivery to the medical service, vehicle location and disposition and aid to trip recovery processes.

Subsections 3.3.5.1 and 3.3.5.2, when read together, demonstrate AMR's contractual duty was not a guarantee—on behalf of Low Country—to all eligible Medicaid members that each trip with Low Country would be safe and timely.

Rather, AMR's duty was to track each trip and follow up to verify it was *completed* safely and on time, and if a trip was not, then to make the appropriate arrangements by "aid[ing] trip recovery processes."

A review of other provisions in the Contract further demonstrates the circuit court's interpretation of section 3.3.5 was inconsistent with the parties' intent. For instance, section 1.2 of the Contract, titled "Intent," is rather instructive:

Through this [RFP,] . . . [SCDHHS] will contract with up to three [b]rokers to administer the daily functions of the NEMT Program. Specifically, the [b]roker(s)' responsibilities will include, but are not limited to, operating a call center and contracting with transportation providers to fulfill the services. The [b]roker must establish a system that ensures high quality and appropriate medical transportation services are provided to South Carolina's Medicaid population. The [b]roker must pay transportation providers in accordance with the terms of the written service agreement between the [b]roker and each transportation provider.

Likewise, section 1.3 provided the objective of the Contract was for SCDHHS "to procure a qualified broker to improve the efficiency and effectiveness and to administer the core components of the SCDHHS's NEMT Program." Thus, when read in context, subsection 3.3.5 merely set forth another administrative duty, not a duty amounting to AMR's guarantee of safety to all eligible Medicaid recipients of the NEMT program. Although the Contract directed AMR to "establish a system that ensures high quality and appropriate medical transportation services are provided," we find the parties did not intend for section 3.3.5 to require that AMR serve as an insurer of passengers' safety during each Low Country trip.

The circuit court next found AMR had a duty to ensure its transportation providers complied with all applicable state and federal laws and regulations, citing section 3.3.15 of the Contract. Section 3.3.15, in pertinent part, provides the following:

The Offeror must include a Monitoring Plan in the initial proposal. The [b]roker is responsible for all services provided by transportation providers. The [b]roker must ensure adequate oversight of transportation providers and ensure that they comply with all applicable [s]tate and [f]ederal laws and regulations. The [b]roker must monitor the transportation providers to ensure compliance with the terms of their subcontracts and ensure compliance with all transportation provider-related requirements of this RFP including driver requirements[;] vehicle requirements[;] complaint resolution[;] and delivery of courteous, safe, timely[,] and efficient transportation services. The monitoring [p]lan should address how the [b]roker will collect and verify the accuracy of performance data obtained from the NEMT providers.

While AMR did, as the circuit court noted, have a contractual duty to ensure Low Country complied with applicable laws and regulations, this duty was irrelevant to the circuit court's ultimate resolution of the issues in this case—the court made no legal or factual findings as to whether AMR breached this duty.[6] To the extent the court relied upon the second and fourth sentences in section 3.3.15 to hold AMR had an absolute duty to provide safe transportation, we find the court erred in overlooking a key portion of the provision and reading it out of context.

Under section 3.3.15, the "delivery of courteous, safe, timely[,] and efficient transportation services" is expressly one of the "transportation provider-related requirements," not a broker requirement. The parties' intention to distinguish the requirements of a "broker" from that of a "transportation

---

**6.** The only mention of facts pertaining to this particular phrase appears in the second footnote of the order, in which the court briefly noted that Low Country experienced some administrative difficulties with the South Carolina Secretary of State's Office regarding its corporate status. The circuit court, however, did not rule upon whether any actions by AMR or Low Country violated the law or otherwise had anything to do with the accident in this case.

provider" is evidenced throughout the Contract. In section 1.2, for example, the parties expressly stated the intent of the Contract was for "the [b]roker's responsibilities [to] include ... contracting with transportation providers to fulfill the services." AMR, as the broker, could "only operate vehicles to provide transportation services in [the] very limited circumstances" outlined in 42 C.F.R. § 440.170(a)(4)(ii)(B). Because—as Gary's counsel conceded at oral argument—none of those limited circumstances were applicable, the Contract did not permit AMR to provide transportation services to Gary or any other Medicaid member. Given that AMR could not provide transportation services itself, but rather served only as the broker of such services, we find it illogical to read the Contract as imposing an absolute duty upon AMR to provide safe transportation.

As the broker, AMR's duty with respect to section 3.3.15 was only to monitor and ensure Low Country complied with the terms of its subcontract and all transportation provider-related requirements, as well as to "have written procedures in place for taking appropriate corrective action whenever inappropriate or substandard services [we]re furnished" by Low Country. The parties did not intend to shift liability to AMR in this provision. Although certain sentences—when read in isolation—may seem to imply that AMR being "responsible for all services provided by the transportation providers" is the equivalent of AMR being liable for all services provided by Low Country, we find such a narrow interpretation is inconsistent with the parties' intent as to this section and the Contract as a whole. The quoted sentences were all part of section 3.3.15's requirement that AMR include a monitoring plan in its initial proposal to address how it would "collect and verify the accuracy of performance data obtained by the NEMT providers" and report back to SCDHHS.

In sum, nothing in the four corners of the Contract indicates the parties intended for AMR to serve as Low Country's insurer of absolute safety for every NEMT trip. *Cf. Dixon v. Whitfield*, 654 So.2d 1230, 1232 (Fla. Dist. Ct. App. 1995) (finding a school board had no nondelegable duty because "[s]chool boards owe their pupils a duty of reasonable care in providing them with safe transportation, but they are not insurers of students' safety"). In fact, section 3.3.7 of the

Contract stated AMR was responsible for ensuring transportation providers obtained and maintained the required and adequate insurance coverage throughout the term of the Contract. *Cf. id.* (finding although the appellants argued the school board "should not be allowed to avoid liability by choosing to contract for buses from outside sources," the relevant statutes and regulations "clearly allow[ed] the [s]chool [b]oard to do so, provided the contractors have the necessary insurance coverage and the buses are properly inspected").

Therefore, we hold the circuit court erred by reading selected portions of sections 3.3.5 and 3.3.15 to find the parties intended to impose upon AMR an absolute duty to provide safe transportation because such a narrow interpretation failed to give effect to the parties' intent as expressed in the Contract as a whole. *See Koon v. Fares*, 379 S.C. 150, 155, 666 S.E.2d 230, 233 (2008) ("The purpose of the rules of contract construction is to ascertain the intention of the parties as gathered from the contents of the entire document and not from any particular provision within the contract."); *Stanley v. Atl. Title Ins. Co.*, 377 S.C. 405, 414, 661 S.E.2d 62, 67 (2008) (stating a contract is "interpreted according to the terms the parties have used, and the terms are to be taken and understood in their plain, ordinary, and popular sense"); *Ecclesiastes Prod. Ministries v. Outparcel Assocs., LLC*, 374 S.C. 483, 498–99, 649 S.E.2d 494, 502 (Ct. App. 2007) ("It is fundamental that[,] in the construction of the language of a [contract], it is proper to read together the different provisions therein dealing with the same subject matter, and where possible, all the language used should be given a reasonable meaning." (second alteration in original) (quoting *Brady v. Brady*, 222 S.C. 242, 246, 72 S.E.2d 193, 195 (1952))); *id.* at 500, 649 S.E.2d at 503 ("The court must enforce an unambiguous contract according to its terms, regardless of the contract's wisdom or folly, or the parties' failure to guard their rights carefully."). The Contract, through its numerous provisions regarding AMR's responsibilities and duties as a broker within the NEMT program, unambiguously imposed no such duty.

We further find the circuit court's error in interpreting the nature and extent of the duties and responsibilities AMR owed under the Contract controlled its analysis of this issue and,

thus, led to the erroneous conclusion that AMR owed an absolute, nondelegable duty to provide safe transportation. *Cf. Young*, 374 S.C. at 368, 649 S.E.2d at 492 (noting the local board's status as a separate entity with powers and duties separate from DDSN in holding DDSN owed no nondelegable duty).

While it is difficult to define the exact circumstances under which a nondelegable duty will be found, a review of case law reveals that our courts' decisions regarding whether to apply the nondelegable duty doctrine are primarily grounded in public policy considerations. *See, e.g., Simmons II*, 341 S.C. at 50, 533 S.E.2d at 322 (stating the decision to hold a hospital owes a nondelegable duty to render competent service to emergency room patients, like those made by other courts considering the issue, was grounded primarily in public policy considerations).

In its order, the circuit court stated SCDHHS's Contract "clearly indicate[d] that public policy and its Contract" imposed a nondelegable duty upon AMR. The court, however, failed to mention any policy considerations that led it to reach this conclusion. Further, aside from consistently pointing to the amount of money AMR received under the Contract, a point which the circuit court declined to acknowledge as relevant to this case, Gary failed to offer any policy arguments below supporting the imposition of a nondelegable duty. Specifically, Gary offered no legislative, judicial, or regulatory expression of public policy that would support a finding that AMR owed a nondelegable duty under the Contract. We do not believe a mere passing reference to the general concept of public policy provided a sufficient basis upon which the court could find a nondelegable duty existed. *Cf.* McWilliams & Russell, *supra*, at 453–54 (noting "[n]ondelegable duty is liability without fault and[,] therefore, in our fault-based tort system, is strong medicine, assigned only on the basis of potent policy" (footnote omitted)).

We find public policy does not favor finding a nondelegable duty in this case. First, facilitating and monitoring the *nonemergency* transport of Medicaid patients does not involve inherent danger or qualify as an abnormally dangerous activity. *See* F. PATRICK HUBBARD & ROBERT L. FELIX, THE SOUTH

CAROLINA LAW OF TORTS 744–45 (4th ed. 2011) ("[One] broad area involving nondelegable duties is where the work involves inherent or intrinsic danger. Similarly, a person engaged in abnormally dangerous activity is responsible for injuries resulting from that activity even if they are caused by an independent contractor. Vicarious liability in such a case is supported by the underlying policies that justify imposing strict liability for injuries from abnormally dangerous activities on the persons conducting such activities."). Second, notwithstanding Gary's argument, nothing in the record indicates he would not be made whole by Low Country in the event it was found vicariously liable for Kirkland's alleged actions. In fact, under the Contract, AMR receives a fee for ensuring Low Country maintains the amount of insurance coverage that the General Assembly, as a matter of public policy, has determined is sufficient in this state. Third, finding AMR liable for any and all accidents would be in direct contravention of the State's objective for entering into the Contract—for AMR to improve efficiency and effectiveness in administering the NEMT program for SCDHHS—because it would unreasonably increase costs. Fourth, and most importantly, Gary cannot point to a statute, regulation, or provision of the Contract that expressly shifted liability to AMR.

Additionally, to the extent the circuit court relied upon any control AMR had, we find the amount of control AMR exercised over Low Country pales in comparison to that which the hospital in *Simmons II* exercised over its emergency room physicians. Under the Contract, SCDHHS maintained the right to direct AMR to fire transportation providers' drivers for substandard services or failure to comply with various requirements. Thus, AMR's control was still subject to and limited by the ultimate control SCDHHS retained over certain functions. While AMR inspected ambulances to ensure compliance with regulations, it did not furnish any tools or equipment to Low Country. The parties do not dispute the fact that Low Country is an independent contractor. Gary also expressly abandoned any argument for imposing a nondelegable duty in this case under an apparent agency or estoppel theory. Therefore, although AMR did exercise some control over Low Country, we do not believe the level was such that we should impose a nondelegable duty based upon this factor alone.

■ No controlling authority in South Carolina—or any other jurisdiction—supports the proposition that AMR owed NEMT program recipients a nondelegable duty to provide safe transportation and could be held liable for the alleged negligence of an employee of its subcontractor. *See Whitfield*, 654 So.2d at 1232 (rejecting appellants' nondelegable duty argument and noting the parties cited no controlling authority, and the court could find none, to support "the proposition that the safe transportation of public school students is a nondelegable duty"). A plain reading of the Contract demonstrates SCDHHS and AMR unambiguously did not intend to create a nondelegable duty, and we are unable to find any substantive policy reasons to support imposing one in this case.[7] Accordingly, we hold the circuit court erred in finding AMR owed Gary a nondelegable duty to provide safe transportation. Because the nondelegable duty doctrine was the sole basis upon which the circuit court found AMR liable, we reverse the grant of summary judgment in favor of Gary as to his negligence and loss of consortium claims.[8]

---

7. Even if AMR did owe a nondelegable duty, it would not be absolute. Given that a hospital's nondelegable duty to render competent services to emergency room patients is not absolute, it would be illogical to hold a broker who arranges nonemergency transportation services owes an absolute duty to provide safe transportation to qualified recipients. *Cf. Simmons II*, 341 S.C. at 50, 533 S.E.2d at 322 (concluding it was unnecessary "to impose an *absolute* nondelegable duty on hospitals" to render competent services to emergency room patients).

8. Unlike the concurrence, we are not prepared to say AMR owed no duty at all to Gary. *See Simmons I*, 330 S.C. at 123, 498 S.E.2d at 412 (noting "[t]he difference between direct liability and a nondelegable duty is subtle but important"). With a stated intent of creating an NEMT system "that ensures high quality and appropriate medical transportation services are provided to South Carolina's Medicaid population," SCDHHS and AMR clearly entered into the Contract for the benefit of eligible Medicaid recipients, a class of which Gary is a member. *See Dorrell*, 361 S.C. at 318, 605 S.E.2d at 14 ("A tortfeasor may be liable for injury to a third party arising out of the tortfeasor's contractual relationship with another, despite the absence of privity between the tortfeasor and the third party."); *id.* at 318, 605 S.E.2d at 15 ("The tortfeasor's liability exists independently of the contract and rests upon the tortfeasor's duty to exercise due care."). In this case, however, the nondelegable duty doctrine was the sole theory under which Gary pursued his negligence claim. Our holding is, therefore, limited to finding AMR owed no absolute, nondelegable duty to provide safe transportation based upon the Contract or public policy.

## II. Full and Fair Opportunity to Conduct Discovery

In light of our resolution of the above issues, we decline to address whether the circuit court erred in prematurely granting summary judgment when AMR was not afforded a full and fair opportunity to conduct discovery. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

## CONCLUSION

Based on the foregoing analysis, we **REVERSE** the circuit court's grant of summary judgment in favor of Gary as to his negligence and loss of consortium claims and **REMAND** for further proceedings consistent with this opinion.

HUFF, A.C.J., concurs.

FEW, A.J., concurring:

I concur in the result reached by the majority, but not the analysis. I would decide this case on a narrow point—AMR had no duty of due care arising under the Contract or otherwise regarding the manner in which Low Country or its employees drove the ambulance. Because AMR had no duty of due care in the first place, I do not believe it is necessary to discuss nondelegable duty.